**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

EUGENE CARTER,

      Petitioner,

v.

CAROL HOWES,

      Respondent.

_____/

CASE NO. 2:08-CV-14228
HONORABLE VICTORIA A. ROBERTS
UNITED STATES DISTRICT JUDGE

**OPINION AND ORDER DENYING THE
PETITION FOR WRIT OF HABEAS CORPUS**

Eugene Carter, ("Petitioner"), a state prisoner confined at the Lakeland Correctional Facility,

seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In his *pro se* application, Petitioner

challenges his Wayne Circuit Court conviction for three counts of armed robbery, MICH. COMP.

LAWS § 750.529, and one count of felony-firearm. MICH. COMP. LAWS § 750.227b.  The trial court

sentenced Petitioner as a fourth time habitual felony offender to two concurrent terms of 43-to-80

years for his armed robbery convictions and a consecutive 2-year term for his firearm conviction.

For the reasons stated below, the application for writ of habeas corpus is **DENIED.**

## I.  Background

The charges against Petitioner arose from a January 15, 2000, robbery of a drug store in

Redford Township, Michigan.

The evidence presented at trial showed that at approximately 9:30 p.m. two men entered a

Rite-Aid pharmacy located on Telegraph Road.  After walking around the store, they approached

the cash register with a six-pack of beer.  One of the men placed the beer on the counter in front of

1

Corletha Miller, the cashier.  The man then reached into his jacket, pulled out a silver handgun, said "this is a holdup," and ordered Miller to give him the money from the cash register.  Miller opened the register and handed the gunman the entire till.  The man took the till and left the store.

Meanwhile, the second man, identified by three employees as Petitioner, held a gun to the head of the store manager, Ignacio Liwag.  Petitioner ordered Liwag to surrender his jewelry and wallet.  After Liwag complied, Petitioner directed Liwag to take him to the safe.  Liwag led the gunman to the office where the safe was located.  Liwag opened the safe, which contained approximately $1,500 in cash.  Petitioner grabbed the money from the safe.  Valerie Reed, who worked in the pharmacy, observed Petitioner go into the office with Liwag.

After he removed the money from the safe, Petitioner led Liwag back to counter where Miller was standing, and he asked for a plastic shopping bag.  Miller handed the robber a plastic bag, and Petitioner placed a canvas bag inside the plastic bag.  Petitioner then demanded Miller's jewelry.  She gave him her necklace, which had an anchor pendant, two bracelets, and two rings.  Petitioner placed the jewelry in his pockets.  Miller identified jewelry items produced by the prosecutor at trial as those taken from her during the robbery.

After Petitioner took her jewelry, he asked where the other robber had gone. Reed told him that the other robber had already left.  Petitioner then left the store with the plastic bag.  Reed locked the doors behind him.

As she locked the doors, Reed saw the robber walk across Telegraph Road to the Sunoco gas station.  She observed a black Ford Explorer "sliding around him" in the gas station parking lot. Reed then observed Petitioner get up off the ground.  He appeared to be bent over.  She then heard gunshots coming from the direction of the gas station.  Reed then observed Petitioner walk away.

2

Reed also testified that she observed Petitioner before the preliminary examination when police brought him into the courthouse.  She and Liwag  were standing in the courthouse hallway when Petitioner was brought into the courthouse.  She denied that her identification of Petitioner was based on seeing him at the preliminary examination.

Diana Dailey testified that she walked into the Rite Aid store behind the two robbers.  When she realized a robbery was taking place, she left.  Dailey climbed into her Ford Explorer and told her husband, Robert, that the store was being robbed.  Robert drove across the street to the Sunoco gas station.  They went into the gas station and told the manager to call the police.  While the gas station manager was calling the police, the Daileys returned to their vehicle.  As they prepared to drive out of the parking lot, a man dressed in black, whom Ms. Dailey assumed was the robber, walked across the street from the Rite Aid and right in front of their vehicle.

Robert hit the man with his truck, and the man fell down and fired his gun.  A bullet entered the truck through the driver's side window, grazed off of Ms. Dailey's head, hit the door jamb, and then landed in the back seat.  She received stitches to close up the bullet wound to her head.  Neither Diana nor Robert Dailey was able to identify the perpetrator.

Redford Township police received a run to the Rite Aid at 9:55 p.m., and officer David Grimlin and Eric Gillman arrived approximately fifteen minutes after the final robber left.  After interviewing the store employees, Grimlin learned that  gunshots had possibly been fired across the street at the gas station.  While searching the Sunoco parking lot, Gillman found a large bundle of cash on the ground by the pay telephones.

Gillman then searched a nearby alley, where he discovered more money, the plastic bag with the canvass bag inside, and some blood.  Police also discovered a handgun on the roof of a nearby

3

collision shop.  Because there was a shell in the ejection port, Gillman could tell that the weapon had been fired.  Partial fingerprints found on the handgun and its magazine could not be matched to Petitioner's.  An officer testified that he observed blood on the Rite Aid bag, and on a roll of quarters.       Police provided information to dispatch that one of the robbers had been hit with a truck, and they asked for area hospitals to see if any treated injuries consistent with being hit by a truck.  Information was later received that an individual had been treated for such injuries at Grace Sinai Hospital, located in the area of the crime scene.

At that hospital, a security guard received three-hundred and eighty dollars, an assortment of jewelry, including two rings, two bracelets, two necklaces, and one gold anchor pendant from a patient who identified himself as Larry Cox.

Detective Adam Pasciek interviewed Larry Cox at the hospital.  Pasciek noted that Cox had a lump over one of his eyes.  Cox explained to Pasciek that he and a friend were at a gas station at Six Mile and Telegraph roads.  While at the gas station, two men tried to rob him.  One of the men hit him on the head with a gun, and as he tried to flee, the people who tried to rob him were driving an SUV and ran him over.

At trial, Pasciek identified Petitioner as the person who identified himself as Larry Cox at the hospital.  When Pasciek asked Larry Cox where he obtained the jewelry, Cox responded that he found the jewelry on the ground.  He further responded that he won the money found on him while gambling.  When Pasciek questioned him about his address, Cox told Pasciek he did not know the address of his residence, but indicated that he lived in the area of Eight Mile and Burgess.

Pasciek interviewed Larry Cox again the following day at the Redford Police Station.  During this second  interview, Petitioner identified himself as Michael Erron Carter.  He indicated

4

that he lived on Hubbell Street in Detroit, but did not know the address.  After running the man's fingerprints through the fingerprint identification system, Pasciek learned that he was in fact, Petitioner.

Pasciek showed the jewelry recovered from Petitioner to Miller and Liwag.  They identified the jewelry as theirs.  The bullet that struck Ms. Dailey was determined to have been fired from the gun found on the roof.  The parties stipulated that DNA testing showed that the blood found on a roll of quarters, and the white plastic Rite Aid bag matched Petitioner's blood.

Petitioner testified in his own defense at trial.  Petitioner explained that he was in the area driving two friends to a meeting with a man who sold stolen automotive parts.  Petitioner stepped out of the car to buy cigarettes at a gas station located at Five Mile and Telegraph Road.  He saw a woman at the gas station's entrance yelling that some men were robbing the Rite Aid.  She asked the gas station attendant to call the police.  At this point, Petitioner decided to return to the car to warn his friend that someone was planning to call the police.  He was afraid that police would find his friend with the stolen automobile accessories.

As Petitioner was returning to the car, he saw a man who -- although he tried to jump out of the way -- was caught by the side of the Explorer and was knocked down. Petitioner  testified that he walked toward the Explorer to see if the man was okay.  The Explorer then slid on the snow, spun out, and struck Petitioner as well. The impact knocked Petitioner down.  As he hit the ground, he heard a gunshot.  The man then grabbed Petitioner's shirt and hit him in the face with a gun.  The man then put the gun to Petitioner's neck and ordered him to walk to the alley.  He pushed Petitioner into a garbage can and began rummaging through his pockets.  As he pulled a few dollars from Petitioner's pockets, some bills fell to the ground.  The gunman slammed Petitioner's head on the

garbage can and hit him in the back of the head.

Petitioner saw a light shining in the alley, and he told the man that the police were coming. The gunman released him, and Petitioner ran down the alley to a bar. He told a bar employee he had been robbed and beaten with a gun. An employee from the bar drove him to the hospital. Upon his arrival at the hospital, Petitioner told the hospital security guard that a car hit him and a robber stole his money and hit him on the head. He also told the guard he thought he had been shot.

Petitioner admitted that he identified himself as Larry Cox when he was admitted to the hospital. He explained that he previously used that name at the same hospital when admitted for a leg injury so he could avoid paying the hospital bill. Petitioner denied that the jewelry belonged to any of the witnesses. Petitioner claimed that he earned the money found on him by working for his cousin at a car wash. He also testified that his mother gave him part of the jewelry. Specifically, she gave him two rings, one bracelet, a pendant, and a chain. It was his aunt's jewelry, who died at a hospital earlier on January 15. Petitioner claimed that the link chain bracelet and the diamond rope chain he wore for personal use. Petitioner testified that he had $400.00 in small bills on him at the time of his hospitalization.

The jury chose to believe the prosecution's case and not Petitioner, and it found him guilty of three counts of armed robbery, and one count of possession a firearm during the commission of a felony. He was sentenced to three concurrent 43-to-80 year sentences for the robbery convictions and a consecutive 2-year term for the firearm conviction.

Petitioner appealed by right. The brief filed by his appellate counsel and his pro se supplemental brief raised what now form his first four habeas claims. The Michigan Court of Appeals affirmed in an unpublished opinion. *People v. Carter*, 2003 Mich. App. LEXIS 36 (Mich.

6

Ct. App. Jan. 10, 2003). Petitioner sought to appeal this decision to the Michigan Supreme Court, but his application for leave to appeal was denied. *People v. Carter*, 469 Mich. 900, 669 N.W.2d 814 (2003).

Petitioner then filed a motion for relief from judgment in the trial court. The motion raised what now form his fifth through eighth habeas claims. The trial court denied the motion in an opinion and order dated May 21, 2007, because "defendant has failed to establish good cause for not previously raising these issues in his post conviction reviews by the above mentioned courts." Petitioner appealed this decision, but both state appellate courts denied relief under Michigan Court Rule 6.508(D). *People v. Carter*, No. 280166 (Mich. Ct. App. Nov. 21, 2007); *People v. Carter*, 481 Mich. 911, 750 N.W.2d 184 (2008).

Petitioner now seeks a writ of habeas corpus on the following grounds:

I. Petitioner was subjected to an unduly suggestive identification procedure when eyewitnesses saw him being brought into the courtroom in handcuffs prior to the preliminary examination.

II. Petitioner's request for a corporeal lineup was erroneously denied by the trial court.

III. The trial court displayed his bias when he stated that Petitioner "committed a crime against the people" and "the state," during the jury selection process.

IV. Petitioner received inadequate notice of the habitual-offender charge.

V. An eyewitness committed perjury by testifying to irreconcilably inconsistent descriptions of Petitioner's appearance.

VI. The trial court erred in refusing to strike for cause a juror who had previously been shot in the face.

VII. Petitioner was denied the effective assistance of trial counsel.

VIII. Petitioner was denied the effective assistance of appellate counsel for failing to raise the above issues in his appeal of right.

7

## II.  Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

The Supreme Court explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*,

8

521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, No. 2011 WL 148587, * 11 (U.S. 2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. 770.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id*. Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id*. (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

9

## III.  Discussion

### A. Suggestive Identification

Petitioner first claims that prosecution witness Valerie Reed saw him being led into the courtroom in handcuffs while she was sitting in the hallway prior to the preliminary examination. He asserts that this encounter constituted an impermissibly suggestive identification procedure that created a substantial likelihood of irreparable misidentification by Reed during the preliminary examination.

Due process protects against the admission of evidence derived from suggestive identification procedures. *Neil v. Biggers*, 409 U.S. 188, 196 (1972).  "[T]he primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Id*. at 198 (*quoting Simmons v. United States*, 390 U.S. 377, 384 (1968)).  If the pretrial procedure was impermissibly suggestive, the question is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id*. at 199.  "To determine whether an allegedly suggestive pre-trial identification casts an impermissible taint on a later in-court identification, a court utilizes  a two-step evaluation." *Mills v. Cason*, 572 F.3d 246, 251 (6th Cir. 2009) (*citing Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir. 1994)).  First, the court must decide whether the pretrial procedure was unduly suggestive. *Id*. at 251.  The question is whether "the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection." *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009).  Second, if the pretrial procedure was unnecessarily suggestive, the court must consider "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199.  "If an identification is reliable, it will be admissible even

if the confrontation was suggestive." *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005).

Here, before Petitioner's case proceeded to trial, defense counsel moved to prevent Reed from identifying Petitioner at trial due to the incident in the hallway prior to the preliminary examination. Defense counsel noted that no line-up had been conducted for Reed at the time of the incident, and that her in-court identification of Petitioner at the exam was the product of the confrontation in the hallway. The prosecutor responded that Reed testified at the examination about the extent of her observations of Petitioner during the robbery and how Petitioner had altered his appearance since that time. The trial court found that the incident did not taint the identification, and he allowed Reed to identify Petitioner at trial.

The Michigan Court of Appeals rejected the claim on the merits during Petitioner appeal of right:

> In this case, Reed identified defendant at trial less than a year after the robbery and at the preliminary examination only a month after the incident. Additionally, defendant was in the store in question for twenty to thirty minutes the night of the robbery, including fifteen minutes from the time he and his accomplice initially drew their guns. Although defendant's back faced her during part of the encounter, she had ample opportunity to observe him during the robbery. Viewing the circumstances as a whole, the pretrial confrontation was not so suggestive that it led to a substantial likelihood of misidentification. [*People v. Williams*, 244 Mich. App. 533, 542 (2001)].
>
> Moreover, even if an error occurred with regard to Reed's identification of defendant, the error was harmless beyond a reasonable doubt given that two other store employees identified defendant as the perpetrator and given the additional evidence supporting defendant's guilt. Accordingly, reversal is unwarranted.

*Carter, supra*, at *2.

This decision did not involve an unreasonable application of the test clearly established by Supreme Court law. Undoubtably, the confrontation in the hallway outside the courtroom was suggestive. Observing a man being led into a courtroom in handcuffs certainly suggests that he is

the individual the authorities believe committed the crime.  But that is not the end of the analysis.  A court reviewing this type of claim must also determine "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199.  Reed testified that she had between twenty and thirty minutes to observe Petitioner during the robbery in the well-lit store.  Petitioner did not attempt to cover his face during the robbery.  In fact, Reed testified that she greeted Petitioner and the other man as they entered the store.  She observed the robbery take place at the front counter, and she watched as Petitioner walked the store manager to the office in back.  When Petitioner returned from the back, he asked Reed where his accomplice had gone, and Reed noticed the disappointment on his face when she informed him that he had already left.  Given the prolonged circumstances of Reed's observations of Petitioner, it was not objectively unreasonable for the state appellate court to determine that her identification of Petitioner was reliable despite the incident in the hallway.

Moreover, Petitioner has a greater difficulty, and it is one that applies to many of his claims.  In order to demonstrate entitlement to habeas relief, a habeas petitioner must show that any errors had a substantial influence on the jury's determination of his guilt. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (ruling that for purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict"); *see also Fry v. Pliler*, 551 U.S. 112, 117-18 (2007) (confirming that *Brecht* standard applies in "virtually all" habeas cases).  "To determine the effect of the error under *Brecht*, [the court should] consider both the impact of the [error] and the overall weight of the evidence presented at trial." *Peterson v. Warren*, 311 F. App'x 798, 805 (6th Cir. 2009), citing *Brecht*, 507 U.S. at 639.

12

The evidence presented against Petitioner was overwhelming. Three employees at the drug store identified Petitioner as one of the robbers. While oftentimes stranger identification evidence can give rise to doubts, Petitioner did not wear a mask and lingered and interacted with the employees for an extended period of time. After the robbery, Petitioner ran across the street and was hit by an SUV. His blood ended up on some of the proceeds from the robbery found in a nearby alley, and worse, at the hospital he was discovered to be in possession of the personal jewelry taken from the drug store employees. Petitioner's implausible story at trial was that he was kidnaped by the "true" robber at the gas station. The real clincher, though, was his testimony that the various pieces of jewelry belonged to him. The unstated premise is that the employees of the drug store lied when they identified the jewelry as belonging to them. But setting aside the fact that Petitioner offers no good reason why the victims would lie, he certainly cannot explain how the employees were able to tell the police about the stolen jewelry *before* Petitioner was caught with it. That is, the case against Petitioner was very strong, and any error in admitting Reed's identification testimony did not have a substantial impact in the result. Habeas relief is not warranted based on this claim.

## B. Failure to Conduct a Lineup

Petitioner next says that the trial court erred by failing to order a corporeal lineup for Corletha Miller, who was not called as a witness at the preliminary examination. Specifically, Petitioner asserts that because Miller was not called as a witness at the preliminary examination and was not present there when Petitioner was brought into the courtroom, he had a right to test her identification prior to trial in a corporeal lineup.

Michigan law grants a trial court discretion to order a corporeal lineup. *People v. McAllister*, 241 Mich. App. 466, 471 (2000). The Constitution, however, does not create a right to a lineup.

13

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Regardless of whether state law conferred on Petitioner a right to participate in a lineup, a criminal defendant "enjoys no constitutional right to participate in a corporeal lineup." *Payne v. Smith,* 207 F.Supp.2d 627, 645 (E.D.Mich. 2002); *see also, Morris v. Giurbino*, 162 Fed. Appx. 769, 771 (9th Cir. 2006) ("[T]he United States Supreme Court has never held that a criminal defendant has a constitutional right to a pretrial lineup"); *Reyes v. Slayton*, 341 F. Supp. 926, 927 (W.D. Va. 1972). Because this claim does not concern a violation of constitutional rights, Petitioner is not entitled to habeas relief.

## C. <u>Trial Court's Statement During Jury Selection</u>

Petitioner's third claim asserts that the trial court denied his right to a fair trial by informing prospective jurors during the jury selection process that Petitioner had "committed a crime against the people" and "against the state."

During jury selection, a philosophically minded prospective juror asked the trial court why it was appropriate for him to sit in judgment of another person:

> Juror No. 5: I'm not religious, but I have a feeling. I feel that why should I have to judge someone for a crime they committed or did not commit? If that crime was that important for that person to commit, why not let the Lord be the determiner of their, their punishment or whatever.

> The Court: Well, you know, that's probably a good question. Maybe the Lord might do that. But he's committed a crime against people, he's committed a crime against the state, and the state has a duty and obligation, and that's why we're all here today. [Trial, Vol I, p 28.]

Defense counsel did not object to the comment. Petitioner challenged it for the first time

14

during his appeal of right, and the state appellate court denied it on the merits:

> Viewing the record as a whole, we conclude that the trial court's comments did not deprive defendant of a fair and impartial trial. Viewed in context, the trial court's brief comments, to which defendant did not contemporaneously object, did not rise to the level of a bench determination of defendant's guilt and were not an attempt to improperly shift the burden to defendant or to deny defendant his presumption of innocence. . . . Additionally, the trial court's instructions to the prospective jurors about the presumption of innocence and its instructions to "keep an open mind throughout the entire course of the case [and] during deliberations" cured any prejudicial effect from the court's comments. We cannot conclude that the trial court abused its discretion by denying the motion for a new trial.

*Carter, supra*, at *2-3.

The Due Process Clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or an interest in the outcome of the case. *See Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). Judicial misconduct claims involve two types of cases. One group addresses charges of "judicial bias" stemming from a trial judge's "personal interest" in the outcome of a case, usually derived from some extrajudicial association with the cause or one of the parties. *See  In re Murchison*, 349 U.S. 133, 136 (1955). The second group concerns charges of "judicial misconduct" in which the trial judge is accused of conducting the proceedings in a manner which exhibits a "deep-seated favoritism or antagonism that would make fair judgment impossible." *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994); *see also Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002). A constitutional violation occurs only when a judge's rulings or statements show "a predisposition so extreme as to display clear inability to render fair judgment." *Johnson v. Bagley*, 544 F.3d 592, 597 (6th Cir. 2008).

The finding by the state appellate court that Petitioner's trial was not rendered unfair by this isolated comment was reasonable. The jury in Petitioner's case was repeatedly instructed regarding the presumption of innocence. Immediately after the prospective jury panel was sworn, the trial

court informed them that they would be deciding the case and not the court.  The trial court also instructed the prospective jurors that Petitioner was presumed to be innocent, and that "presumption of innocence starts at the beginning of this case, lasts throughout the entire case, and even up and during your deliberations, you have to give [Petitioner] that presumption of innocence." Tr. 11-27-00, at 13-14.  The jury was similarly instruction on the presumption of innocence after they were empaneled and again after the reception of the evidence.  Jurors do not check their common sense at the door when they enter a courtroom.  If the isolated comment is read literally and in isolation, it would be completely at odds with the trial court's multiple instructions regarding the presumption of innocence.   In light of the multiple instructions regarding the presumption of innocence, the comment would not have been interpreted by the jury as an indication that the trial court was predisposed to believe that Petitioner was guilty.  Rather, the comment was intended, and would have been interpreted by the presumptively rational jurors, as being an off-the-cuff answer to the prospective juror's question about why it was appropriate to serve as a juror.  The decision of the state court was correct and did not unreasonably apply established federal law.

### D. <u>Habitual Offender Notice</u>

Petitioner's fourth claim asserts that he received insufficient notice that he was being charged as a habitual felony offender.

To the extent that Petitioner contends that the prosecutor failed to comply with Michigan Court Rule 6.112 and Michigan Compiled Law 769.13, he has failed  to state a cognizable claim upon federal habeas review because it is a state law claim. *See Tolbert v. LeCureaux*, 811 F. Supp. 1237, 1240-41 (E.D. Mich. 1993).

As far as federal law is concerned, due process does not require advance notice that a trial

16

on a substantive criminal charge will be followed by a habitual offender enhancement. Due process only requires that a defendant be given reasonable notice and an opportunity to be heard. *See Oyler v. Boles*, 368 U.S. 448, 452 (1962). The record reveals that Petitioner and defense counsel received sufficient notice of the habitual offender enhancement. The Criminal Information filed by the prosecutor at the start of the trial court proceedings notified Petitioner that he was being charged as a fourth-time felony offender. Petitioner never challenged the validity of the prior convictions at the sentencing hearing, and he did not indicate any surprise. Petitioner was adequately informed that he was being charged as a habitual offender. Habeas relief is not warranted on this claim.

### E. Claims Raised on State Collateral Review

Petitioner's remaining four claims were raised in his motion for relief from judgment filed in the trial court after his appeal of right. His fifth claim asserts that prosecution witness Miller committed perjury by giving inconsistent descriptions of the perpetrators. His sixth claim asserts that one of the jurors was biased because he had previously been shot in the face. His seventh claim asserts that his trial counsel was ineffective for various reasons. Finally, his eighth claim asserts that his appellate counsel was ineffective for failing to raise these claim in his appeal of right. These claims are procedurally defaulted because the state court relied on an independent and adequate state law ground to deny relief.

The Michigan Court of Appeals and Michigan Supreme Court denied relief with respect to these claims by citing Michigan Court Rule 6.508(D), which provides, in part, that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good

17

cause for the failure to raise such grounds previously and actual prejudice resulting therefrom. See MICH. CT. R. 6.508(D)(3). The United States Court of Appeals for the Sixth Circuit recently held that the form order used by the Michigan Supreme Court to deny leave to appeal in this case, is unexplained because its citation to Michigan Court Rule 6.508(D) is ambiguous as to whether it refers to a procedural default or a rejection on the merits. *See Guilmette v. Howes*, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc). Consequently, under *Guilmette*, the Court must "look through" the unexplained order of the Michigan Supreme Court to the state trial court's decision to determine the basis for the denial of state post-conviction relief. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).

In this case, the state trial court denied relief on procedural grounds, barring review of Petitioner's claims. The trial court denied Petitioner's motion for relief from judgment because Petitioner failed to establish good cause and prejudice for his failure to raise his new issues during his direct appeal. The language used by the state trial court is a reference to the default provision contained in Rule 6.508(D)(3). That rule prevents a defendant from raising issues in a motion for relief from judgment that were not raised earlier, unless the defendant is able to demonstrate good cause for failing to raise them earlier, and he can show he would suffer actual prejudice from a failure to review the new claims. The invocation of Rule 6.508(D)(3)'s language by the state trial court amounts to the imposition of an independent and adequate state law ground for the state court's decision that bars review of his claims in this action. *See, e.g.,McBride v. Woods,* 2011 U.S. Dist. LEXIS 123555 ( E.D. Mich. Oct. 26,

18

2011). Accordingly, these claims are procedurally defaulted.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman*, *supra*.

Petitioner's eighth claim asserts ineffective assistance of appellate counsel as cause to excuse the procedural default of his other claims.  Petitioner has not shown that appellate counsel was ineffective.   In order to establish ineffective assistance of appellate counsel, Petitioner must show "that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). In determining whether counsel's performance was deficient,

> [t]he court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance . . . . At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland v. Washington*, 466 U.S. 668, 690 (1984).  Therefore, judicial scrutiny of counsel's performance must be "highly deferential." *Id.* at 689.  The defense is prejudiced only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

19

It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy . . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754.

Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," defined as an issue which was obvious from the trial record and would have resulted in reversal on appeal. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

20

Petitioner fails to show that by omitting the claims presented in his motion for relief from judgment, appellate counsel's performance fell outside the wide range of professionally competent assistance. Appellate counsel presented legitimate and viable issues in Petitioner's direct appeal. In fact, Petitioner still advances those same claims in this petition. Petitioner has not shown that appellate counsel's strategy in presenting those claims and not raising the claims contained in the motion for relief from judgment was deficient or unreasonable. Petitioner fails to demonstrate that appellate counsel was ineffective so as to establish cause to excuse his procedural default. These claims are barred from review.

More importantly, Petitioner has not shown that he would be prejudiced by a failure to review his claims. "Prejudice, for purposes of procedural default analysis, requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002) (*citing United States v. Frady*, 456 U.S. 152, 170-71). None of Petitioner's defaulted claims worked to his actual and substantial disadvantage because the evidence of his guilt was overwhelming. As indicated above, Petitioner was caught virtually red-handed. He was found at the hospital in possession of the victims' jewelry. At trial he incredibly claimed that it belonged to him. He was identified by all three victims, and his blood was found on the plastic bag and coin wrapper associated with the robbery. Petitioner is in prison because of the weighty evidence of his guilt, not because of alleged errors in his state post-conviction review proceeding.

21

### IV.  <u>Conclusion</u>

The Court denies the petition for writ of habeas corpus.  The Court also denies a certificate of appealability to Petitioner.  In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.  A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F. 3d 900, 901 (6th Cir. 2002).

The Court denies Petitioner a Certificate of Appealability.  He fails to make a substantial showing of the denial of a federal constitutional right.  Jurists of reason would not find this Court's resolution of Petitioner's claims to be debatable or that he should receive encouragement to proceed further. *Siebert v. Jackson,* 205 F. Supp. 2d 727, 735 (E.D. Mich. 2002).

Although this Court will deny a certificate of appealability to Petitioner, the standard for granting an application for leave to proceed *in forma pauperis* (IFP) is a lower standard than the standard for certificates of appealability. *See Foster v. Ludwick,* 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002)(citing *United States v. Youngblood*, 116 F. 3d 1113, 1115 (5th Cir. 1997)).  While a certificate of appealability may only be granted if petitioner makes a substantial showing of the denial of a constitutional right , a court may grant IFP status if it finds that an appeal is being taken

22

in good faith. *Id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. *Foster,* 208 F. Supp. 2d at 765. Although jurists of reason would not debate this Court's resolution of Petitioner's claim, the issues are not frivolous; therefore, an appeal could be taken in good faith and Petitioner may proceed in forma pauperis. *Id.*

## V.   **ORDER**

The Court DENIES

   (1) The Petition for Writ of Habeas Corpus; and

   (1) A Certificate of Appealability.

The Petitioner is **GRANTED** leave to appeal *in forma pauperis.*

**IT IS ORDERED.**

   _/s/ Victoria A. Roberts_____
   Victoria A. Roberts
   United States District Judge

Dated:  December 1, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 1, 2011.

s/Linda Vertriest_____
Deputy Clerk

23